**Matthew Kaplan, OSB No. 980699**
Email:       matthew@mdkaplanlaw.ocm
KAPLAN LAW LLC
50 SW Pine Street, Suite 302
Portland, OR 97204
Telephone:   (503) 226-3844
Facsimile:   (503) 943-6670

**John Devlin, OSB No. 042690**
Email:       john@johndevlinlaw.com
DEVLIN LAW, P.C.
434 NW 19th Avenue
Portland, OR 97209
Telephone:   (503) 228-3015
Facsimile:   (503) 660-4079

**Chad Stavley, OSB No. 034656**
Email:       chad@stavleylaw.com
LAW OFFICE OF CHAD STAVLEY, P.C.
434 NW 19th Avenue
Portland, OR 97209
Phone:       (503) 546-8812
Fax:         (503) 243-1944

Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| InTRUSTMENT NORTHWEST, INC., personal representative for the Estate of Andrew K. Potter, Deceased,<br><br>     Plaintiff,<br><br> v.<br><br>WELLPATH, LLC, a Delaware corporation; CORRECT CARE SOLUTIONS, LLC, a Kansas corporation; COLUMBIA COUNTY, an Oregon county; DR. VIVEK SHAH, an individual; NANCY RONAN, an individual; MARILYN CADE, an individual; WYATT KISTNER, an individual; SAMANTHA FOLSOM BISHOP, an individual; KELSIE HANSON, an individual; | Civil Action No.<br><br>**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 USC § 1983) AND SUPPLEMENTAL STATE CLAIMS**<br><br>**DEMAND FOR TRIAL BY JURY** |

BRIAN PIXLEY; an individual; BROOKE
MCDOWALL, an individual; and JOHN DOES
1-20, individuals,

                                    Defendants.

## INTRODUCTION

1.      On January 31, 2022, Andrew Potter (then age 28) was arrested and taken to the Columbia County Jail.  The jail medical staff (employed by Wellpath) diagnosed Mr. Potter with a penile abscess and prescribed antibiotics.  Over the next two months, Mr. Potter experienced a number of symptoms consistent with a serious infection – a burning sensation in his veins, repeated abnormal vital signs, dizziness, repeated high temperatures, shaking, and sweating.  He eventually could not walk to the medical clinic, could not get out of bed, and stopped eating.  After 58 days in custody, the jail medical staff sent Mr. Potter to Legacy Emanuel Medical Center, where he was admitted to the intensive care unit in critical condition.  He died five days later of tricuspid valve infective endocarditis due to bacteremia.  Andrew Potter died of a treatable infection that was allowed to spread throughout his body during his time in the Columbia County Jail.  He is survived by his father and his mother.

## JURISDICTION AND VENUE

2.      This action arises under the constitution and laws of the United States and jurisdiction is based on 28 USC § 1331 and 28 USC § 1343(a).  This Court has pendent jurisdiction of the state law claims pursuant to 28 USC § 1367.

**PARTIES**

3.      Plaintiff InTrustment Northwest, Inc. is the duly appointed personal representative of the Estate of Andrew K. Potter, deceased.  Andrew Potter was born in Roseburg, Oregon, on December 14, 1993.  At the time of his death, Andrew Potter was a citizen and a resident of the State of Oregon.  He is survived by his father and his mother.

4.      At all times herein pertinent, Andrew Potter was a pretrial detainee in the Columbia County Jail.

5.      Wellpath, LLC ("Wellpath") is a Delaware corporation authorized to do business in the State of Oregon.  Its business is providing medical and mental health services in jails and prisons nationally, and in the Columbia County Jail specifically. Wellpath was formed in November 2018 as a result of a merger between Correct Care Solutions, LLC ("CCS") and Correctional Medical Group Companies ("CMGC").  CCS was a Kansas corporation authorized to do business in the State of Oregon.  Throughout this Complaint, they will be referred to as "Wellpath/CCS."

6.      From January through April 2022, Wellpath/CCS was providing the medical services at the Columbia County Jail.  At all times herein pertinent, Wellpath/CCS was acting under color of state law.

7.      Wellpath/CCS released a video message from its leadership – CEO Jorge Dominicis and President Kip Hallman – to announce its new name in November 2018. Dominicis said that Wellpath's mission was to "provide quality care to every patient with compassion, collaboration and innovation."  Dominicis added: "It's missionary work."

Hallman explained that "we are health care providers working in collaboration with our partners, who have other things they are responsible for, and we are the ones who are responsible for bringing the patients we serve, the people they serve, along a path to wellness that * * * can make communities healthier and safer.  I think that's very important."  Dominicis said that "Wellpath means a whole new way of thinking about healthcare, especially for people who are underserved and [] in a difficult place.  Wellpath is why we do what we do, because we really want to help people, because we think we can make a difference, because we think we can bring them hope, and because we think we can help them on a path to a healthier life."

8.     Columbia County is an Oregon county.  Columbia County operates a jail and has contracted with Wellpath/CCS to provide all necessary medical care to pretrial detainees and persons convicted of crimes held at the Columbia County Jail.

9.     Dr. Vivek Shah is a medical doctor licensed by the State of Oregon.  At all times pertinent, Dr. Shah was employed by Wellpath/CCS as the Regional Medical Director for the region that included Oregon.  Dr. Shah was an agent of Wellpath/CCS, actual or implied, acting within the course and scope of his agency.  He is a citizen and resident of the State of California.

10.     Nancy Ronan is a nurse practitioner licensed by the State of Oregon.  At all times pertinent, Ms. Ronan was employed by Wellpath/CCS as a nurse practitioner.  Ms. Ronan was an agent of Wellpath/CCS, actual or implied, acting within the course and scope of her agency.  On information and belief, she is a citizen and resident of the State of

Oregon.

11.     Marilyn Cade is a registered nurse licensed by the State of Oregon.  At all times pertinent, Ms. Cade was employed by Wellpath/CCS as a registered nurse in the Columbia County Jail.  Ms. Cade was an agent of Wellpath/CCS, actual or implied, acting within the course and scope of her agency.  On information and belief, she is a citizen and resident of the State of Oregon.

12.     Wyatt Kistner is a licensed practical nurse licensed by the State of Oregon. At all times pertinent, Mr. Kistner was employed by Wellpath/CCS as a licensed practical nurse in the Columbia County Jail.  Mr. Kistner was an agent of Wellpath/CCS, actual or implied, acting within the course and scope of his agency.  On information and belief, he is a citizen and resident of the State of Oregon.

13.     Samantha Folsom Bishop is a licensed practical nurse licensed by the State of Oregon.  At all times pertinent, Ms. Bishop was employed by Wellpath/CCS as a licensed practical nurse in the Columbia County Jail.  Ms. Bishop was an agent of Wellpath/CCS, actual or implied, acting within the course and scope of her agency.  On information and belief, she is a citizen and resident of the State of Oregon.

14.     Kelsie Hanson is a licensed practical nurse licensed by the State of Oregon. At all times pertinent, Ms. Hanson was employed by Wellpath/CCS as a licensed practical nurse in the Columbia County Jail.  Ms. Hanson was an agent of Wellpath/CCS, actual or implied, acting within the course and scope of her agency.  On information and belief, she is a citizen and resident of the State of Oregon.

15.    Brian Pixley has been the Sheriff of Columbia County since January 2019. At all times pertinent, Sheriff Pixley was acting as an agent of Columbia County, actual or implied, acting within the course and scope of his agency. Sheriff Pixley was responsible for ensuring that people being held at the Columbia County Jail from January to April 2022 were receiving constitutionally adequate medical services.

16.    Brooke McDowall was the Corrections Lieutenant for the Columbia County Sheriff's Office from January 2020 through April 2022. At all times pertinent, Lieutenant McDowall was acting as an agent of Columbia County, actual or implied, acting within the course and scope of his agency. Lieutenant McDowell oversaw the day-to-day operations of the jail and was responsible for ensuring that people being held at the Columbia County Jail from January to April 2022 were receiving constitutionally adequate medical services.

17.    John Does 1-20 are Columbia County Sheriff's Office employees working in the Columbia County Jail as corrections staff members. At all times pertinent, John Does 1-20 were acting as agents of Columbia County, actual or implied, and acting within the course and scope of their agency. John Does 1-20 were responsible for ensuring that people being held at the Columbia County Jail from January to April 2022 were receiving constitutionally adequate medical services.

## FACTUAL ALLEGATIONS

### The Relationship Between Wellpath/CCS and Columbia County

18.    The Columbia County Jail houses pretrial detainees and persons convicted of crimes. Columbia County is obligated by state and federal law to provide medical care

for persons lodged in the Columbia County Jail.  Columbia County's duty to provide medical care is a nondelegable duty.

19.    In 2015, Columbia County contracted with Wellpath/CCS to provide medical care to pretrial detainees and persons convicted of crimes lodged in the Columbia County Jail.

20.    From September 2021 through May 2022, Columbia County and Wellpath/CCS negotiated the terms of a new contract to provide medical care to pretrial detainees and persons convicted of crimes lodged in the Columbia County Jail.

21.    In May 2022, Columbia County agreed to a new contract with Wellpath/CCS.

### Andrew Potter's Incarceration and Decline in the Columbia County Jail

22.    On Monday, January 31, 2022, Andrew Potter was booked into the Columbia County Jail.  He was charged with Criminal Mischief in the First Degree and Theft in the First Degree related to the theft of copper wire from two Portland General Electric radio towers.

23.    That same day, a Wellpath LPN named Kelsie Hanson performed a Receiving Screening for Mr. Potter.  LPN Hanson did not note any medical concerns that required a referral.

24.    Later that day, a Wellpath RN named Marilyn Cade saw Mr. Potter because he reported that his penis was swollen.  RN Cade charted that she contacted the provider, who ordered clindamycin (an antibiotic).  In addition, RN Cade noted that Mr. Potter's

penis was "red, swollen, tender to touch foreskin up to pubis. No discharge noted." On information and belief, the referenced "provider" is DNP Ronan.

25.    On February 1, 2022, a Wellpath LPN named Wyatt Kistner charted that Mr. Potter said that his current medication was causing him to have skin issues. LPN Kistner contacted Wellpath DNP Nancy Ronan, who discontinued the clindamycin and ordered doxycycline (an antibiotic).

26.    On February 4, 2022, DNP Ronan met with Mr. Potter. DNP Ronan noted that Mr. Potter had a pulse of 111 and a blood pressure of 90/58. Her chart note documented that the right lateral anterior shaft of Mr. Potter's penis had a "raised, reddened area." DNP Ronan's assessment was "penile abscess", and her plan was to continue doxycycline and add ceftriaxone (an antibiotic).

27.    On February 11, 2022, LPN Kistner met with Mr. Potter. LPN Kistner documented that Mr. Potter said that he "felt dizzy and that his veins were on fire. Pt stated his neck veins were the worst." LPN Kistner noted that Mr. Potter's pulse was 140 and his blood pressure was 118/82. LPN Kistner contacted the provider, who "instructed to reassure pt." On information and belief, the referenced "provider" is DNP Ronan.

28.    That same day, LPN Kistner scheduled Mr. Potter for a visit with mental health. LPN Kistner wrote on the referral form: "Talked with him for 45 min about his current situation. He was originally seen for emergency. Seems very anxious about his situation."

29.     On February 12, 2022, RN Cade performed a Medical History and Physical Assessment for Mr. Potter.  RN Cade noted that Mr. Potter had a "balance/dizziness" issue.  She documented that his pulse was 96 and his blood pressure was 90/50.  Mr. Potter told RN Cade that his "veins feel like on fire" and that he would "get dizzy."  DNP Ronan reviewed and signed this form on February 18, 2022.

30.     On February 15, 2022, a Wellpath LPC named Sara Foto completed a Mental Health Structured Progress Note for Mr. Potter.  LPC Foto noted that she had spoken with LPN Kistner, who said that Mr. Potter was "anxious about situation – neck veins on fire." LPC Foto also spoke with Mr. Potter and documented that he denied any mental health concerns and was "waiting on tx options."

31.     On February 20, 2022, a Wellpath LPN named Samantha Folsom Bishop met with Mr. Potter.  LPN Bishop documented that a sergeant brought Mr. Potter to medical after seeing him "shaking in pain, crying at pod-day table."  LPN Bishop noted that Mr. Potter reported pain in his knees, legs, and flank.  He said that he had an autoimmune disease that prevented the tendons from forming in his knees.  LPN Bishop indicated that Mr. Potter was "moved to observation for pain management."  LPN Bishop documented that she spoke with the "provider," who ordered Tylenol and a urinalysis.  On information and belief, the referenced "provider" is DNP Ronan.

32.     Later that day, LPN Bishop documented that the "provider" had diagnosed Mr. Potter with a urinary tract infection and ordered ciprofloxacin.  On information and belief, the referenced "provider" is DNP Ronan.

33.    On February 21, 2022, LPN Hanson charted that Mr. Potter said that he was not able to walk.  His pulse was 118 and his blood pressure was 124/82.  LPN Hanson documented that Mr. Potter was slightly clammy and reported right flank pain.  Mr. Potter said that he could walk with pain.  LPN Hanson wrote: "Will update on call provider."  On information and belief, the referenced "provider" is DNP Ronan.

34.    On February 25, 2022, RN Cade referred Mr. Potter to see DNP Ronan for a chronic care visit because of his history of hepatitis C.

35.    On February 28, 2022, Mr. Potter sent an electronic Inmate Medical Request Form.  He wrote: "can i please take a ua I think I have an infection cant get a full breathe of air" and "need different antibiotics".  The following day, LPN Kistner responded: "Will look into this."

36.    On March 2, 2022, LPN Kistner charted that the "provider wants to continue current antibiotic after pt request for new antibiotic.  Pt notified verbally."  On information and belief, the referenced "provider" is DNP Ronan.

37.    On March 3, 2022, Mr. Potter submitted a handwritten Inmate Medical Request Form.  He wrote: "can't get warm and my veins in my legs and groin burn and I can hardly get out of bed."  He also wrote: "Anti-biotics didn't help and gave me severe headaches."  He added: "Sam said to give this directly to an officer so she would see it tonight and be able to see me tonight."  A member of the Wellpath medical staff signed the form that night.

38.     That same evening, Mr. Potter submitted an electronic Inmate Medical Request Form.  He wrote: "I have an infection and need to be seen" and "the previous anti-biotics made my head hurt bad" and "Sam said she would see me tonight if I got this filled out".

39.     That same evening, LPN Bishop met with Mr. Potter.  Her chart note stated: "Seen for kyte.  Pt states shooting pains in groin area, nausea, dizziness, backache, febrile, shivers – hot/cold sweats.  Pt is physically shaking and appears diaphoretic."  Mr. Potter's blood pressure was 106/78, his pulse was 110, and his temperature was 101.4.  LPN Bishop completed a Nursing Documentation Pathway for Urinary Complaints, which indicated urgent interventions that included "observation housing."  LPN Bishop noted that she "[c]alled provider for new orders and pt chart review."  DNP Ronan ordered Bactrim (an antibiotic), Tylenol, additional vital sign checks, electrolyte replacement, and observation housing.  LPN Bishop charted that Mr. Potter was "placed in observation" and she "[e]ducated deputies and pt on checks."

40.     On March 4, 2022, DNP Ronan met with Mr. Potter.  She documented that his blood pressure was 90/50 and his pulse was 140.  She scanned his temperature multiple times, with results from 102.0 to 97.7.  She noted that Mr. Potter was "shaking but as he calmed down, not shaky.  When he left he was walking easily, not hunched over like when he arrived."  Her assessment was "UTI, possibly pyelonephritis."  Her plan was "[r]eviewed urine dip showing infection, done last pm.  Continue Bactrim, Tylenol.  Will do labs."  DNP Ronan ordered a complete blood count and a comprehensive metabolic

panel.

41.    Later that day, LPN Kistner saw Mr. Potter.  The chart note states: "Pt was observed under two blankets with a towel on his head."  Mr. Potter's temperature was 104, his pulse was 123, and his blood pressure was 128/82.  LPN Wyatt contacted DNP Ronan, who ordered Rocephin (an antibiotic).  LPN Kistner gave Mr. Potter a shot of Rocephin and noted that his temperature was 96.8.

42.    On March 7, 2022, LPN Hanson attempted to do a blood draw on Mr. Potter in order to run the complete blood count and a comprehensive metabolic panel.  LPN Hanson was not able to complete the blood draw and notified the "[p]rovider on call."  On information and belief, the referenced "provider" is DNP Ronan.

43.    Later that day, LPN Hanson documented that Mr. Potter refused to go to the medical office to attempt the blood draw again.  RN Cade and LPN Hanson signed a Refusal of Treatment form for Mr. Potter.

44.    On March 11, 2022, DNP Ronan wrote the following note in Mr. Potter's medical chart: "Pt has positive Hep C ab.  Has been at CCJ for 6 weeks, would not evaluate Hep C until he has been here for 3 mo or more to stabilize lab levels.  Will see pt at 3 mo point."  It is not clear from this chart note whether DNP Ronan saw Mr. Potter on this date.  This appears to be the referral made by RN Cade on February 25, 2022.

45.    On March 14, 2022, Mr. Potter submitted an electronic Inmate Medical Request Form.  He wrote: "i need medical antibiotics" and "urinary tract infexion" and "inflamed and still in pain and sick".  The following day, LPN Kistner responded: "Will

discuss with provider."

46.     On March 18, 2022, DNP Ronan met with Mr. Potter.  She documented that he reported feeling weak, dizzy, and blacking out.  His blood pressure was 124/70 and his pulse was 138.  She noted that he had a "mild pallor" and was "trembling but later no tremors."  DNP Ronan's assessment was "[s]yncopal episodes" and her plan was "[s]uspect anemia.  Will start on iron."  DNP Ronan ordered an iron supplement for Mr. Potter.

47.     On March 19, 2022, LPN Kistner saw Mr. Potter after a deputy reported that Mr. Potter "became dizzy and fell backwards."  Mr. Potter's pulse was 105 and his blood pressure was 86/58.  The chart note states: "Pt seen by provider for potential anemia on 3/18. Pt started on iron.  Pt able to stand under own power. Pt [?] to increase water intake and continue to eat full meal.  Provider contacted."  On information and belief, the referenced "provider" is DNP Ronan.

48.     On March 27, 2022, LPN Hanson saw Mr. Potter at the request of a jail deputy.  The chart note indicates: "Pt unkept, urine malodorous in toilet, [?] supine.  See pathway completed. Pt states he is weak and fatigue.  Reports not eating much but drinking fluids.  Reviewed with provider no new orders at this time.  Pt educated to eat small amounts when possible and to stay hydrated."  On information and belief, the referenced "provider" is DNP Ronan.

49.     On March 28, 2022, LPN Hanson saw Mr. Potter.  The chart note indicates: "Pt brought to booking in [wheelchair] by deputies for blood draw.  Draw accomplished by on-call phlebotomist."  The chart note states that Mr. Potter was "kept in booking for

observation."  His blood pressure was 104/60 and his pulse was 96.  The chart note concluded: "On call provider notified."  On information and belief, the referenced "provider" is DNP Ronan.

50.    On March 29, 2022, LPN Kistner saw Mr. Potter "for electrolyte replacement."  LPN Kistner documented that he gave Mr. Potter a full Gatorade bottle and educated him on the importance of "fluid and meal compliance."

51.    On March 30, 2022, at 2:30 pm, LPN Bishop noted that the "provider" reviewed Mr. Potter's labs and "noted dehydration and malnutrition from pt not eating or drinking enough.  Still waiting for CBC diff.  Will continue to monitor."  On information and belief, the referenced "provider" is DNP Ronan.

52.    At approximately 3:00 pm, LPN Bishop saw Mr. Potter.  Her chart note states: "Pt is on watch due to stated extreme fatigue.  Loss of ROM and inability to perform normal ADL's.  Pt is laying on bed on the floor by the door/toilet prone.  I asked him how he was, he states continuing fatigue and new inability to move arms without some pain."  LPN Bishop and Corporal Frazier talked with Mr. Potter about why he would not eat – "he states he can sleep easier when he doesn't eat and eventually he won't wake up."  LPN Bishop and Corporal Frazier completed a Hunger Strike Education and Release form for Mr. Potter.  The chart note indicates that Mr. Potter asked for a shower and states: "Pt has malodor, looks to be urinating on self and has a pale skin tone.  Contacted RN and NP with concerns.  Talked to Sgt and Lt.  Started on I and O safety watch and contacted MH to come at earliest opening.  Will continue to monitor pt."  On information and belief, the

referenced "NP" is DNP Ronan.

53.    At approximately 6:00 pm. LPN Bishop documented that a deputy in booking contacted medical to report that Mr. Potter ate none of his dinner and drank 70% of the Gatorade.  She wrote: "Will continue to monitor pt status."

54.    At approximately 7:00 pm, LPN Bishop saw Mr. Potter.  His pulse was 130-152 laying prone.  He was pale and disheveled.  LPN Bishop "noticed pt has left sided swelling of body including his eye from laying so long on it.  Pt unable to make fist or open left hand w/o difficulty.  A strong smell of urine and feces became noticed when flipping him.  I called NP on call who stated to take to the hospital.  I explained to deputies he needs to go and they proceeded to call an EMT.  The pt wanted to be cleaner so deputies and myself assisted him when taking a shower.  Pt will stay in our custody, was sent to Emanuel."  On information and belief, the referenced "provider" is DNP Ronan.

55.    John Does 1-20 observed Andrew Potter during his time in custody.  Mr. Potter was repeatedly taking showers because he felt like his veins were on fire.  He repeatedly asked John Does 1-20 for help and described his symptoms set forth above. John Does 1-20 observed that Mr. Potter eventually was not able to get out of bed or perform his activities of daily living.  At least one of John Doe 1-20 told Mr. Potter that he was faking his symptoms.

56.    The jail file maintained by the Columbia County Sheriff's Office does not contain any documentation of Mr. Potter's move to an observation cell.  The jail file also does not contain any documentation of any observations of Mr. Potter made by any jail

deputies.

## Andrew Potter's Hospitalization and Death

57.     On the evening of March 30, 2022, an EMT and a paramedic from Columbia River Fire & Rescue ("CRF&R") responded to the jail.  The CRF&R crew documented that the "jail RN" said that Mr. Potter "has been in custody for 52 days had multiple infections, won't complete his antibiotics, was detoxing from heroin/bentos[sic]/meth, has been on a hunger strike for the last two days.  She says that he recently had labs done that came back abnormal for liver and kidney function so the medical director wants him taken in.  She says that pt has been unable to move or get up to make it to the toilet so they are just finishing up bathing him after he has urinated and defecated on himself.  Pt found walking out of the shower room with deputy.  He presents as pale and genuinely ill looking, though fully mobile."

58.     At Legacy Emanuel, the initial evaluation noted that Mr. Potter "[a]rrives very ill-appearing" and "dehydrated appearing."  Mr. Potter was admitted to the intensive care unit in critical condition.

59.     On March 31, 2022, the Columbia County Sheriff's Office released Mr. Potter from its custody.

60.     During his hospitalization, the Legacy Emanuel personnel diagnosed Mr. Potter with septic shock, tricuspid valve infective endocarditis, septic emboli, bacteremia, and other related conditions.

61.     Andrew Potter died on April 4, 2022. His doctors determined that his cause of death was tricuspid valve infectious endocarditis due to bacteremia.

62.     Tricuspid valve infective endocarditis is a treatable medical condition. If Mr. Potter had received proper medical treatment while in the Columbia County jail, then he would not have died from tricuspid valve infectious endocarditis due to bacteremia.

63.     On information and belief, no one was disciplined or fired for their treatment of Mr. Potter.

64.     By failing to discipline or fire anyone for their treatment of Mr. Potter, Wellpath/CCS and Columbia County ratified the unconstitutional actions of their employees and agents.

## WELLPATH/CCS DID NOT HAVE A DOCTOR OVERSEEING THE MEDICAL PROGRAM AT THE COLUMBIA COUNTY JAIL

65.     The Wellpath/CCS medical program at the Columbia County Jail did not have a Site Medical Director from January through April 2022.

66.     Dr. Vivek Shah was the Regional Medical Director with responsibility for jails in Oregon, including the Columbia County Jail. On information and belief, he did not provide medical care for people housed in the Columbia County Jail. On information and belief, he did not oversee the work being done by the Wellpath/CCS medical staff in the Columbia County Jail.

67.     Dr. Shah has testified previously that he does not supervise the doctors and nurse practitioners (also known as "providers") in his region. He has testified that he supports those providers, who practice under their own licenses.

68.     DNP Nancy Ronan was the provider for Wellpath/CCS at the Columbia County Jail.  On information and belief, DNP Ronan went to the jail once a week to provide medical care for people in custody.  On information and belief, DNP Ronan had a full-time job at Adventist Health while she was working as a nurse practitioner for Wellpath/CCS.  On information and belief, DNP Ronan would respond to phone calls from jail medical staff when she was not at the Columbia County Jail.

69.     In 2017, Magistrate Judge Thomas Coffin of the United States District Court for the District of Oregon issued his Findings & Recommendation in Linda Mae Paris v. Conmed Healthcare Management, Inc., et al., Case No. 6:14-CV-01620- TC.  The case stemmed from the death of Donnie Ray Brown, who was incarcerated in the Coos County Jail in October and November 2013.  Mr. Brown died of a perforated duodenal ulcer in a local hospital, hours after his release from the jail.  He had been experiencing health problems for more than a week, including shortness of breath, vomiting, diarrhea, abdominal pain, leg swelling, and weakness.  He was not taken to the hospital until he began vomiting blood.  By that point, it was too late to save his life.

70.     In his opinion, Judge Coffin began his analysis by writing: "To state the obvious, a corrections facility has a constitutional obligation to provide adequate health care to inmates with serious medical needs."  He then noted that "[t]here is significant evidence in the record from which a jury could conclude that decisions to reduce the inmates' health care coverage to sub-standard levels far below contractual and constitutional obligations were deliberately made and demonstrated indifference to

inmates', specifically Brown's, serious medical needs."

71.    Addressing the issue of whether there was a Medical Director at the Coos County Jail, Judge Coffin wrote that "a jury could reasonably find that Dr. [Steven] Blum was the Medical Director and that his inattention to his duties at the Coos County Jail including his failure to meaningfully oversee or supervise subordinate medical staff at the facility is evidence of deliberate indifference to the serious medical needs of inmates, specifically Donnie Brown, and thus was a causative factor in the deprivation of Brown's constitutional right to adequate medical care."

72.    Dr. Shah knew or should have known about Judge Coffin's 2017 opinion criticizing Dr. Steven Blum's failure to perform his duties as Medical Director at the Coos County Jail.

73.    Dr. Shah knew that the Columbia County Jail medical program did not have a Site Medical Director.  On information and belief, Dr. Shah did not take any steps to ensure that the Columbia County Jail medical program had a Site Medical Director.  On information and belief, Dr. Shah did not take any steps to fulfill the duties of the Site Medical Director at the Columbia County Jail.  On information and belief, Dr. Shah did not take any steps to ensure that DNP Ronan was fulfilling the duties of the Site Medical Director at the Columbia County Jail.

74.    In May 2020, Dr. Shah signed a Stipulation to Informal Disposition with the Washington Medical Commission.  The Stipulation stated that Dr. Shah prescribed Librium for a patient based on a phone call from a registered nurse working at the Kitsap

County Jail. The Stipulation also stated: "Prior to issuing the prescription, Respondent did not consult Patient A's treatment records, perform an examination or consult with the facility's on-call provider."

75.      On information and belief, Dr. Shah did not take any steps to ensure that DNP Ronan was not issuing prescriptions and other medical treatment based on phone calls from the jail medical staff at the Columbia County Jail. On information and belief, Dr. Shah did not take any steps to ensure that DNP Ronan was consulting treatment records or performing examinations before issuing prescriptions and other medical treatment.

## WELLPATH/CCS DID NOT PROPERLY SUPERVISE OR DIRECT THE LICENSED PRACTICAL NURSES WORKING IN THE COLUMBIA COUNTY JAIL

76.      The Oregon Board of Nursing has adopted Oregon Administrative Rule 851-045-0050, entitled "Scope of Practice Standards for Licensed Practical Nurses." OAR 851-045-0050 states that an LPN "has a supervised practice that occurs at the clinical direction and under the clinical supervision of the RN or LIP [Licensed Independent Practitioner] * * * ."

77.      On its website, the Oregon State Board of Nursing states: "At the LPN level of licensure, the practice act does make requirements for clinical direction and supervision of practice. Division 45 of the NPA specifies that LPN practice may only occur under the clinical direction of an RN, or, under the clinical direction of a licensed independent practitioner (LIP) such as a physician. Clinical direction of LPN practice means the communication from the RN to the LPN for the implementation of the RN's established

plan or care or the communication from the LIP to the LPN for the implementation of the LIP's treatment plan.  Any practice by an LPN that occurs outside of an established plan of care is not consistent with the LPN scope of practice."

78.    On its website, the Oregon State Board of Nursing states: "When the client has an established plan of care and the presenting problem is included on that plan of care, the LPN may engage in a *focused assessment* with the client to determine if the presenting issue is addressed in the established plan of care.  If the issue *is* part of the established plan of care, the LPN can reinforce the existing plan.  If the issue *is not* addressed in the established plan, the LPN must defer to the RN or to the LIP who is able to provide a comprehensive assessment and formulate a new plan.  The LPN cannot independently formulate a new plan (even a focused plan of care) outside of the client's known problems. Triage, which is often needed when functioning 'on-call' after normal business hours, is all about gathering data, clarifying questions, determining the status of the client and then determining the plan of care (i.e., the next steps for the client).  When there isn't an established plan of care, these functions are outside of LPN scope of practice."

79.    As set forth above, most of Mr. Potter's medical encounters were with Wellpath employees who had LPN licenses.  Those LPNs documented that they contacted the Wellpath "provider" after their encounters with Mr. Potter.  Given his serious medical needs, this level of clinical direction and clinical supervision was insufficient.  According to the Wellpath medical records, the provider (DNP Ronan) only saw Mr. Potter three times (February 4, March 4, and March 18) during his 58 days in custody.

80.    Prior to January 2022, Wellpath/CCS had notice that it was failing to properly supervise or direct its employees with LPN or LVN licenses.

81.    In Neuroth v. Mendocino County, et al., Case No. 3:15-cv-03226 (N.D. Cal.), the plaintiff alleged in his Fourth Amended Complaint that Wellpath's predecessors (CMGC and CFMG) had "unlawful policies and practices allowing LVN's to work outside their legal scope of practice and without supervision * * * ."  The plaintiff also alleged in his Fourth Amended Complaint that Wellpath's predecessors (CMGC and CFMG) "allow uncredentialed Licensed Vocational Nurses (LVN's) to perform the work of Registered Nurses (RN's) and higher level care providers, in order to save money, since CMGC and CFMG pay LVN's significantly less than they pay RN's."  The plaintiff also alleged in his Fourth Amended Complaint that Wellpath's predecessors (CMGC and CFMG) "allow and require LVN's * * * to work alone and unsupervised in the jail, without the legally required direct supervision by a Registered Nurse or physician."  The plaintiff filed his Fourth Amended Complaint on April 21, 2017.

82.    In Johnson v. City of Redding, et al., Case No. 2:19-cv-01722 (E.D. Cal.), the plaintiff alleged in her Complaint that Wellpath's predecessor (CFMG) "has a long history of having LVN's work alone in county jails, unsupervised, and outside their legal scope of practice, conducting patient assessments."  The plaintiff also alleged in her Complaint that Wellpath's predecessor (CFMG) "was put on notice by the [California Board of Vocational Nursing and Psychiatric Technicians] long before MR. JOHNSON's death that their LVNs were working outside their scope of practice, yet CFMG and its

employees and managing agents, including DOE 1 continued the practice through the jails they serve, including Shasta County jail." The plaintiff filed her Complaint on August 30, 2019.

## WELLPATH/CCS'S HISTORY OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF PEOPLE IN OREGON JAILS

83. In November 2013, Donnie Ray Brown died of a perforated duodenal ulcer in a local hospital, hours after his release from the Coos County Jail. He had been experiencing health problems for more than a week, including shortness of breath, vomiting, diarrhea, abdominal pain, leg swelling, and weakness. He was not taken to the hospital until he began vomiting blood. By that point, it was too late to save his life. During this time period, Wellpath/CCS (then known as Conmed) was providing the medical care at the Coos County Jail.

84. In December 2017, Rocky Stewart died in the Coos County Jail after less than twelve hours in custody. The jail deputies knew that Mr. Stewart was vomiting repeatedly after being booked into the jail. The Wellpath/CCS registered nurse at the jail never saw Mr. Stewart, even though she was outside his cell in the booking area twice. The medical examiner determined that Mr. Stewart died of coronary artery disease, which could have been treated with medication or surgery if Mr. Stewart had been sent to the hospital. During this time period, Wellpath/CCS was providing the medical care at the Coos County Jail.

85. In January 2018, Kathy Norman died in the Yamhill County Jail after a few hours in custody. Ms. Norman was transferred from the hospital, where she had a blood

alcohol level of 0.52 earlier in the day and had been receiving treatment for alcohol withdrawal. When she arrived at the jail, Ms. Norman told the jail staff that she was experiencing alcohol withdrawal. The Wellpath/CCS licensed practical nurse on duty did not take her vital signs or perform a physical examination. The Wellpath/CCS licensed practical nurse spoke by phone with a doctor, who never examined Ms. Norman or reviewed any medical records. Ms. Norman did not receive any medication or other treatment for alcohol withdrawal. She was placed in a medical observation cell, where she was found dead approximately four hours later. The medical examiner determined that her cause of death was complications of chronic beverage alcohol use. During this time period, Wellpath/CCS was providing the medical care at the Yamhill County Jail.

86.     In September 2018, Janelle Butterfield committed suicide in the Josephine County Jail after forty days in custody. Ms. Butterfield had a history of severe mental illness that was known to the staff at the jail, including the medical and mental health providers. During her forty days in custody, Ms. Butterfield did not see a doctor, a nurse practitioner, a physician assistant, or a nurse. Ms. Butterfield was placed in a lock-down unit and was checked on once a day by people with EMT licenses working for Wellpath/CCS. During this time period, Wellpath/CCS was providing the medical care at the Josephine County Jail.

87.     In October 2019, Christina Ryan died in the Coos County Jail after sixteen hours in custody. When she was booked into the jail, Ms. Ryan was able to walk to the booking counter and talk to the jail staff. After she was placed in a holding cell, Ms. Ryan

began to make incoherent noises and flail around in her cell.  The Wellpath/CCS medical staff knew that Ms. Ryan was overdosing on methamphetamine but did not provide any meaningful medical care.  Ms. Ryan ultimately died of acute methamphetamine intoxication.  During this time period, Wellpath/CCS was providing the medical care at the Coos County Jail.

88.    In October 2020, Linda Brown died in the Columbia County Jail after eleven days in custody.  Ms. Brown repeatedly asked the jail staff to take her to a hospital, but the jail staff referred her to the jail medical staff.  Ms. Brown died of complications of liver cirrhosis due to chronic ethanolism.  During this time period, Wellpath/CCS was providing the medical care at the Columbia County Jail.

## WELLPATH'S HISTORY OF DELIBERATE INDIFFERENCE
## TO THE SERIOUS MEDICAL NEEDS OF PEOPLE ACROSS THE COUNTRY

89.    Wellpath/CCS operates in 37 states, with over 15,000 employees.  Its annual revenues are estimated to exceed $1,000,000,000.

90.    In January 2013, Rashod McNulty suffered a heart attack while in the Westchester County (New York) jail.  The Wellpath/CCS medical staff did not send Mr. McNulty to the hospital, even though he reported chest pain and anxiety and even though he collapsed in a hallway.  In June 2015, the New York State Commission of Correction issued a report related to Mr. McNulty's death.  In its report, the Commission found that "McNulty's complaints of chest pain were mismanaged by nursing staff," that the doctor "made a hazardous presumptive diagnosis of abdominal distress on McNulty, a patient presenting with accepted symptoms of acute coronary syndrome, without the benefit of

actually examining McNulty or performing requisite diagnostic tests," that nursing staff "failed to take appropriate action and abandoned McNulty by placing him in his cell" after he collapsed in the hallway, and that "[h]ad McNulty been given appropriate emergency medical care and sent to a hospital in a timely manner his death may have been prevented."

91.     In August 2015, Pierce County (Washington) cancelled its contract with Wellpath/CCS.  The next month, Pierce County's Prosecuting Attorney sent Wellpath/CCS a letter in response to a demand for payment.  In that letter, the Prosecuting Attorney laid out the "many areas in which [Wellpath/CCS] was in default" and then provided the following list: "Failure to verify medications at booking; delay in care; poor quality of care; very poor record keeping at every level; failure to triage; lag times in getting reports, etc. to providers; continued staff shortages and almost weekly turnover; constant lack of leadership; lack of trained personnel; unscheduled shifts; failure to provide basic services; inmate requests for medical services not timely reviewed or addressed; significant pharmacy problems; inmates not getting their medications; staff failure to keep medical records on patients; and a myriad of problems created by ERMA."  The letter continued: "Indeed, the only things [Wellpath/CCS] can fault the County for are (1) believing [Wellpath/CCS] when they made assurances that they would implement measures to bring their operation of the clinic up to medical standards and (2) giving [Wellpath/CCS] time to accomplish it."  The letter explained that "[a] lawsuit against Pierce County would flush out [Wellpath/CCS's] deplorable performance in running the medical clinic, which would not only result in considerable cost and embarrassment to [Wellpath/CCS], but would also

provide evidence to support claims filed by other institutions who suffered the same disappointment as Pierce County."    The letter noted that the County "compiled independent, detailed documentation of countless errors by [Wellpath/CCS] staff" that "will shock the conscience of the court."    The letter concluded by stating that "[a] jury would likely find that [Wellpath/CCS's] operation of the jail medical clinic was incompetent, unprofessional and morally reprehensible."    In March 2019, a jury found that Wellpath/CCS had violated its contract with Pierce County and ordered Wellpath/CCS to pay $1,560,000 to Pierce County.

92.    In October 2017, Fulton County (Georgia) notified Wellpath/CCS that it was terminating the contract to provide medical services for people held at the Fulton County Jail for cause.    The termination letter described a series of uncured deficiencies and noted that "most seriously, the Fulton County Sheriff's Office has reported five deaths at the Fulton County Jail in the last seventy-five days * * *."

93.    In November 2017, the Kitsap County (Washington) Sheriff sent a letter to Wellpath/CCS stating that "[i]n light of recent events and questions I have been asking our staff, I am finding the more I learn, the more questions arise regarding our partnership and relationship with CCS."    The letter then details a list of concerns about the care being provided by Wellpath/CCS.

94.    In September 2018, the Office of the Inspector General of the Department of Homeland Security issued a Management Alert related to the Adelanto ICE Processing Center, where Wellpath/CCS provided the medical care.    The Management Alert found

that "detainees do not have timely access to proper medical care."  During a May 2018 unannounced visit, "we observed two doctors walking through disciplinary segregation and stamping their name on the detainee records, which hang outside each detainee's cell, indicating that they visited with the detainee.  However, we observed them doing so without having any contact with 10 of the 14 detainees in disciplinary segregation.  For the four detainees a doctor did speak with, the doctor asked if the detainee was 'ok' in English, not necessarily a language the detainee understood.  We confirmed with guards that these four detainees were non-English speakers, and the doctor left without any acknowledgment or response from the detainee."  In addition, the Management Alert noted that "[d]etainee statements also corroborated a 2017 outside medical review that reported wait times to see a provider for both acute illness/injury and chronic care needs are often excessively long.  Further, ICE's detainee death reviews for three Adelanto Center detainees who have died since fiscal year 2015 also cited medical care deficiencies related to providing necessary and adequate care in a timely manner."

95.    In December 2018, the Civil Rights Division of the United States Department of Justice concluded that there was reasonable cause to believe that the medical and mental health services at the Hampton Roads (Virginia) Regional Jail were unconstitutional. Wellpath/CCS provided those medical and mental health services.  The DOJ Report noted that "[m]any prisoners at the Jail have serious medical needs requiring treatment, and these prisoners are placed at a substantial risk of serious harm when they do not receive adequate treatment.  The Jail fails to provide adequate intake, discharge planning, sick call, chronic

care, and emergency care such that prisoners are subjected to an unacceptable risk of harm due to delays or lack of treatment."

96.     In June 2019, CNN published an article detailing the results of its investigation of Wellpath and its predecessor companies.  The article stated: "Across the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases.  CCS employees have denied urgent emergency room transfers.  They have failed to spot or treat serious psychiatric disorders and have allowed common infections and conditions to become fatal."

97.     The CNN article included this quote from a former Wellpath/CCS nurse at the Kitsap County (Washington) jail: "CCS is about the mighty dollar.  * * * If they can cut costs . . . who cares who suffers in the process."

98.     In August 2021, the Civil Rights Division of the United States Department of Justice concluded that there was reasonable cause to believe that the medical and mental health services at the San Luis Obispo (California) County Jail were unconstitutional. Wellpath/CCS provided those medical and mental health services.  The DOJ Report noted that "[t]he Jail has subjected prisoners to substantial risk of serious harm by failing to provide adequate medical care.  * * * The Jail has failed to provide a medical screening system that ensures adequate diagnosis and treatment of serious medical conditions and continuity of care; has failed to ensure access to care for prisoners who report medical problems; and has failed to deliver an acceptable quality of care in several areas, including care for prisoners with serious medical conditions like HIV and hypertension, and care for

pregnant women.  These deficiencies have resulted in a system of inadequate medical care that violates prisoners' constitutional rights."

99.    In December 2023, twelve United States Senators sent a letter to Wellpath/CCS to "express deep concern with reports that Wellpath is providing inadequate health care in prisons and jails across the United States."  The letter noted that "[a] host of federal investigations, press reports, and reports by incarcerated people have revealed apparent deficiencies in Wellpath's care."  The letter then summarized a number of those sources.

## **FIRST CLAIM FOR RELIEF**

### **Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983**

100.    Plaintiff realleges and incorporates herein, as though set forth in full, paragraphs 1 through 99, above.

101.    Defendants Ronan, Cade, Kistner, Bishop, and Hanson were deliberately indifferent to Andrew Potter's rights under the Eighth and/or Fourteenth Amendments of the U.S. Constitution in one or more of the following ways:

     a.  In failing to properly treat Andrew Potter's serious medical needs;

     b.  In failing to properly respond to Andrew Potter's complaints regarding his serious medical needs;

     c.  In failing to order appropriate diagnostic tests to diagnose and treat Andrew Potter's serious medical needs;

     d.  In failing to work within the scope of their nursing licenses; and

    e.  In failing to transfer Andrew Potter from the Columbia County Jail to a hospital for diagnosis and treatment until it was too late to save his life.

102.    Defendants John Does 1-20 were deliberately indifferent to Andrew Potter's rights under the Eighth and/or Fourteenth Amendments of the U.S. Constitution in one or more of the following ways:

    a.  In failing to believe Andrew Potter's complaints regarding his serious medical needs;

    b.  In failing to make sure that Andrew Potter received proper medical attention for his serious medical needs; and

    c.  In failing to transfer Andrew Potter from the Columbia County Jail to a hospital for diagnosis and treatment until it was too late to save his life.

103.    As a direct result of the actions and inactions of defendants as set forth in paragraphs 101-102 above, Andrew Potter endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of a treatable infection.  Andrew Potter's parents have been denied his love, society and companionship. Andrew Potter's estate incurred expenses for medical services, burial services and memorial services.  Andrew Potter's estate and his family are entitled to compensatory damages in whatever amount the jury concludes is appropriate.

104. The actions of defendants Ronan, Cade, Kistner, Bishop, and Hanson were recklessly indifferent to the civil rights of Andrew Potter, and callously disregarded Andrew Potter's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

105. Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## SECOND CLAIM FOR RELIEF

**Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983**

*Monell* **Claims**

106. Plaintiff realleges and incorporates herein, as though set forth in full, paragraphs 1 through 105, above.

107. The moving forces that resulted in the deprivation of the Eighth and/or Fourteenth Amendment rights of Andrew Potter were the following policies, customs or practices of Columbia County and Wellpath/CCS:

    a.    A policy, custom or practice of providing insufficient medical coverage;

    b.    A policy, custom or practice of not having a Site Medical Director;

    c.    A policy, custom or practice of allowing employees to work beyond the scope of their nursing licenses;

    d.    A policy, custom or practice of denying people in custody timely transfers to hospitals for emergent medical conditions;

e.      A policy, custom or practice of failing to respond properly to the serious medical needs of people in custody;

f.      A policy, custom or practice of believing that people in custody are faking serious medical symptoms;

g.      A policy, custom or practice of failing to order appropriate diagnostic tests to diagnose and treat the serious medical needs of people in custody; and

h.      A policy, custom or practice of failing to meet widely accepted community standards of care with regard to medical services for people in custody.

108.    The policies of defendants Wellpath/CCS and Columbia County posed a substantial risk of causing substantial harm to people in custody in the Columbia County Jail, and Wellpath/CCS and Columbia County were aware of the risk.

109.    As a direct result of the policies, customs or practices of Wellpath/CCS and Columbia County, Andrew Potter endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of a treatable infection. Andrew Potter's parents have been denied his love, society and companionship. Andrew Potter's estate incurred expenses for medical services, burial services and memorial services. Andrew Potter's estate and his family are entitled to compensatory damages in whatever amount the jury concludes is appropriate.

110.   The actions of defendant Wellpath/CCS were recklessly indifferent to the civil rights of Andrew Potter, and callously disregarded Andrew Potter's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is appropriate.

111.   Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## THIRD CLAIM FOR RELIEF

**Civil Rights Claim – 8th and/or 14th Amendments – 42 USC § 1983**

**Supervisory Liability**

112.   Plaintiff realleges and incorporates herein, as though set forth in full, paragraphs 1 through 111, above.

113.   Defendants Shah, Ronan, Pixley, and McDowall, in their supervisory capacities, were aware of the policies, customs or practices as alleged in paragraph 107, above, and were aware that said policies, customs or practices created a substantial risk of causing substantial harm to people in custody in the Columbia County Jail by endangering their physical safety and their medical and mental health needs.  Despite their knowledge, said supervisors allowed, approved of and ratified said policies, customs or practices.

114.   Defendants Shah, Ronan, Pixley, and McDowall, in their supervisory capacities, failed to adequately train Wellpath/CCS and Columbia County employees:

    a.   To provide people housed in the Columbia County Jail with proper
         medical attention to their serious medical needs;

b.  To recognize medical emergencies;

c.  To properly respond to complaints regarding serious medical needs;

d.  To order appropriate diagnostic tests to diagnose and treat the serious medical needs of people in custody;

e.  To work within the scope of their nursing licenses; and

f.  To timely transfer people housed in the Columbia County Jail to the hospital for emergent medical conditions.

115.    Defendants Shah, Ronan, Pixley, and McDowall were aware that the failure to train set forth in paragraph 114, above, created a substantial risk of causing harm to Columbia County inmates.

116.    As a direct result of the actions and inactions of defendants Shah, Ronan, Pixley, and McDowall, Andrew Potter endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of a treatable infection. Andrew Potter's parents have been denied his love, society and companionship. Andrew Potter's estate incurred expenses for medical services, burial services and memorial services. Andrew Potter's estate and his family are entitled to compensatory damages in whatever amount the jury concludes is appropriate.

117.    The actions of defendants Shah and Ronan were recklessly indifferent to the civil rights of Andrew Potter, and callously disregarded Andrew Potter's physical safety, and punitive damages should be awarded in whatever amount the jury concludes is

appropriate.

118.    Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action.

## FOURTH CLAIM FOR RELIEF

### Negligence

119.    Plaintiff realleges and incorporates herein, as though set forth in full, paragraphs 1 through 118, above.

120.    The actions of defendants Wellpath/CCS and Columbia County, acting by and through their employees and agents, were negligent in one or more of the following particulars:

  a. In failing to provide Andrew Potter with proper medical attention for his serious medical needs;

  b. In failing to properly respond to Andrew Potter's complaints regarding his serious medical needs;

  c. In failing to order appropriate diagnostic tests to diagnose and treat Andrew Potter's serious medical needs;

  d. In failing to work within the scope of their nursing licenses; and

  e. In failing to transfer Andrew Potter from the Columbia County Jail to a hospital for diagnosis and treatment until it was too late to save his life.

121.    The actions of defendants Wellpath/CCS and Columbia County, acting by and through their employees and agents, and Shah, Ronan, Pixley, and McDowall, were negligent in one or more of the following particulars:

a.   In allowing, approving and ratifying the policies, customs or practices as alleged in paragraph 107, above;

b.   In failing to adequately train Wellpath/CCS and Columbia County employees to provide people housed in the Columbia County Jail with proper medical attention to their serious medical needs;

c.   In failing to adequately train Wellpath/CCS and Columbia County employees to recognize medical emergencies;

d.   In failing to adequately train Wellpath/CCS and Columbia County employees to properly respond to complaints regarding serious medical needs;

e.   In failing to adequately train Wellpath/CCS and Columbia County employees to order appropriate diagnostic tests to diagnose and treat the serious medical needs of people in custody;

f.   In failing to adequately train Wellpath/CCS employees to work within the scope of their nursing licenses; and

g.   In failing to adequately train Wellpath/CCS and Columbia County employees to timely transfer people housed in the Columbia County Jail to the hospital for emergent medical conditions.

122.    As a direct result of the actions and inactions of defendants, and each of them, Andrew Potter endured and suffered severe physical and emotional distress, his medical condition was exacerbated, and he died of a treatable infection.  Andrew Potter's parents have been denied his love, society and companionship.  Andrew Potter's estate incurred expenses for medical services, burial services and memorial services.  Andrew Potter's estate and his family are entitled to compensatory damages in whatever amount the jury concludes is appropriate.

123.    Notice pursuant to the Oregon Tort Claims Act was given to defendant Columbia County within the time prescribed by law.

## FIFTH CLAIM FOR RELIEF

### Gross Negligence/Reckless Misconduct

124.    Plaintiff realleges and incorporates herein, as though set forth in full, paragraphs 1 through 123, above.

125.    Defendant Wellpath/CCS, by and through its employees acting within the scope of their employment, was grossly negligent and acted with reckless misconduct in one or more of the following particulars:

  a.   In failing to provide Andrew Potter with proper medical attention to his serious medical needs;

  b.   In failing to properly treat Andrew Potter's serious medical needs;

  c.   In failing to properly respond to Andrew Potter's complaints regarding his serious medical needs;

d.  In failing to order appropriate diagnostic tests to diagnose and treat Andrew Potter's serious medical needs;

e.  In failing to work within the scope of their nursing licenses;

f.  In failing to transfer Andrew Potter from the Columbia County Jail to a hospital for diagnosis and treatment until it was too late to save his life;

g.  In allowing, approving and ratifying the policies, customs or practices as alleged in paragraph 107, above;

h.  In failing to adequately train Wellpath/CCS and Columbia County employees to provide people housed in the Columbia County Jail with proper medical attention to their serious medical needs;

i.  In failing to adequately train Wellpath/CCS and Columbia County employees to recognize medical emergencies;

j.  In failing to adequately train Wellpath/CCS and Columbia County employees to properly respond to complaints regarding serious medical needs;

k.  In failing to adequately train Wellpath/CCS and Columbia County employees to order appropriate diagnostic tests to diagnose and treat the serious medical needs of people in custody;

l.  In failing to adequately train Wellpath/CCS employees to work within the scope of their nursing licenses; and

m.  In failing to adequately train Wellpath/CCS and Columbia County

employees to transfer people housed in the Columbia County Jail to

the hospital if the person is experiencing a medical emergency.

126.   As a direct result of the misconduct of defendant Wellpath/CCS, Andrew

Potter endured and suffered severe physical and emotional distress, his medical condition

was exacerbated, and he died of a treatable infection.  Andrew Potter's parents have been

denied his love, society and companionship.  Andrew Potter's estate incurred expenses for

medical services, burial services and memorial services.  Andrew Potter's estate and his

family are entitled to compensatory damages in whatever amount the jury concludes is

appropriate.

127.   The actions of defendant Wellpath/CCS were grossly negligent, were

recklessly indifferent to the civil rights of Andrew Potter, and callously disregarded

Andrew Potter's physical safety, and punitive damages should be awarded in whatever

amount the jury concludes is appropriate.

WHEREFORE, Plaintiff prays for judgment as follows:

**On the First Claim for Relief**, for judgment against defendants Ronan, Cade,

Kistner, Bishop, Hanson, and John Does 1-20, and each of them, for compensatory

damages in whatever amount the jury concludes is appropriate, and for punitive damages

in whatever amount the jury concludes is appropriate, and for necessarily and reasonably

incurred attorney fees and costs;

**On the Second Claim for Relief**, for judgment against defendants Wellpath/CCS and Columbia County, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages against defendant Wellpath/CCS in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred attorney fees and costs;

**On the Third Claim for Relief**, for judgment against defendants Shah, Ronan, Pixley, and McDowall, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for punitive damages against defendants Shah and Ronan in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred attorney fees and costs;

**On the Fourth Claim for Relief**, for judgment against defendants Wellpath/CCS, Columbia County, Shah, Ronan, Pixley, and McDowall, and each of them, for compensatory damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred costs;

**On the Fifth Claim for Relief**, for judgment against defendant Wellpath/CCS for compensatory damages in whatever amount the jury concludes is appropriate, for punitive damages in whatever amount the jury concludes is appropriate, and for necessarily and reasonably incurred costs.

DATED this 9th day of February, 2024.

KAPLAN LAW LLC

/s/ Matthew Kaplan
Matthew Kaplan, OSB No. 980699
matthew@mdkaplanlaw.com

Trial Attorney: Matthew Kaplan


DEVLIN LAW, P.C.

/s/ John Devlin
John T. Devlin, OSB No. 042690
john@johndevlinlaw.com

Trial Attorney: John Devlin


LAW OFFICE OF CHAD STAVLEY, P.C.

/s/ Chad Stavley
Chad Stavley, OSB No. 034656
chad@stavleylaw.com

Trial Attorney: Chad Stavley

Of Attorneys for Plaintiff

Plaintiff demands Trial by Jury.


DATED this 9th day of February, 2024.


                                KAPLAN LAW LLC

                                /s/ Matthew Kaplan
                                Matthew Kaplan, OSB No. 980699
                                matthew@mdkaplanlaw.com

                                Trial Attorney: Matthew Kaplan


                                DEVLIN LAW, P.C.

                                /s/ John Devlin
                                John T. Devlin, OSB No. 042690
                                john@johndevlinlaw.com

                                Trial Attorney: John Devlin


                                LAW OFFICE OF CHAD STAVLEY, P.C.

                                /s/ Chad Stavley
                                Chad Stavley, OSB No. 034656
                                chad@stavleylaw.com

                                Trial Attorney: Chad Stavley

                                Of Attorneys for Plaintiff